**In the interst of ANGELA PITSCH, a child.**
No. 34138.
Juvenile and Domestic Relations Court, Palm Beach County.
November 27, 1972.

John C. Thomas, Boca Raton, for the petitioners.

Richard Jorandby, Assistant County Solicitor, for the child and for the Division of Family Services.

LEWIS KAPNER, Judge.

This cause is presented upon a motion for contempt filed by Kathlyn Ann Pitsch (respondent) and a motion for rehearing filed by Mr. and Mrs. George Houghton (petitioners). The petitioners are represented by John Thomas, Esq. The respondent is not represented by counsel but Richard Jorandby, Assistant County Solicitor, is present on behalf of the child Angela Pitsch and the Division of Family Services.

The petitioners are parents of the respondent Kathlyn Pitsch, age nineteen, and the grandparents of respondent's daughter Angela Pitsch, born November 13, 1971. Kathlyn is presently separated from her husband whose whereabouts are unknown. She is living with one Edward Doetsch whom she plans to marry when she obtains a divorce from her husband.

This matter was first presented to this court on a petition for custody filed by Mr. and Mrs. Houghton on October 3, 1972. A hearing on this petition was held on October 26, 1972. At that hearing the court made no ruling regarding custody but granted respondent visitation rights for each Saturday and Sunday from 10 a.m. to 4 p.m.

Subsequent to the hearing this court was notified that petitioner-Mrs. Houghton was refusing to comply with this order unless she received a written court order. This court, personally and through its representatives, informed both Mrs. Houghton and her attorney that the verbal order had as much force as a written one.

Arrangements were made between petitioners and respondent for respondent to pick up the child at petitioners' weekend cottage in Lake Placid, Florida. Respondent arrived approximately twenty minutes late and the child was sleeping. Respondent was told to come back at noon which she did. Petitioners then informed respondent that she might take the child only if the child was returned by 2 p.m.

Mr. Houghton has testified that they were insistent upon the 2 p.m. return because the child's regular nap time is 2 p.m. and because respondent and Mr. Doetsch had to be in Boca Raton by 6 p.m. (Boca Raton is a three hour drive from Lake Placid.) He further testified that they believed that the respondent was not going to return the child at all, but no evidence has been presented to substantiate this intention. It is clear from the events and the evidence that the petitioners were resistent to permitting visitation at all.

Respondent refused to take the child under these circumstances and left and did not return Sunday because of petitioners' apparent refusal to comply with the court order.

Based upon the evidence produced at the hearing and subsequent information obtained from Dr. Donald Norman this court ordered petitioners to return custody of the child to respondent forthwith.

Petitioners refused to do this. Petitioner-Mrs. Houghton immediately left the area with the child and left no word where she had gone. Counsel for the petitioners filed a petition for a rehearing but no permission was granted to petitioners to keep the child pending consideration of that petition. Petitioner-Mr. Houghton testified that he did not know where Mrs. Houghton went but he was satisfied that she and the child were safe. Mrs. Houghton in fact went to their cottage in Lake Placid.

Petitioners assumed custody of the child in May of 1972. Although the respondent signed an "affidavit" consenting to this transfer of custody it is clear from the evidence that she in fact was opposed to it. This affidavit states that Kathlyn Pitsch — "agrees to go along with the wishes of both the Welfare Dept. and Judge Kapner, juvenile court of the state of Florida . . . that [Angela Pitsch] be left in temporary custody, of Mr. and Mrs. George Houghton, until [Kathlyn Pitsch] can prove to all parties concerned, that she is capable of providing all the necessities and comforts for her daughter . . . This Affidavit is binding until a formal Petition, is filed with the juvenile courts . . . Also it is understood by both parties involved that this is only a temporary arrangement." (sic)

This affidavit was signed by the respondent and sworn to before Mrs. Mary Bergamini, director of the Welfare Department for the city of Boca Raton.

With reference to this affidavit, this court was contacted by several persons around May of 1972 regarding this case. The court made only general suggestions at the time, including a suggestion to refer the case to the Division of Family Services, and stated that if the mother voluntarily agreed to let her parents have temporary custody of her child, then it was not this court's concern since the court assumes no jurisdiction unless a child is either taken into custody by an agency or unless a petition of dependency has been filed. While these remarks apparently were interpreted as the "wishes" of this court, this court had at the time no wishes concerning this matter and had received only sketchy information over the phone regarding the situation.

The child was taken into custody by Mrs. Dorothy McLarty, mother of Mrs. Houghton, in May of 1972.

When Kathlyn's husband abandoned her Mrs. McLarty assisted Kathlyn's move into a new apartment. One evening, approximately one week after this move, Mrs. McLarty was socializing with Mr. and Mrs. Houghton. They were discussing Kathlyn and were growing increasingly "madder" over the fact that Kathlyn had not contacted them since the move. Mrs. McLarty took it upon herself that evening to go to Kathlyn's apartment to check up on her. When she arrived at the apartment building (at 2 or 3 o'clock in the morning) she first went to the wrong apartment but was then directed to Kathlyn's apartment. Kathlyn was with a male companion and a commotion ensued causing the landlady to call the police. Mrs. McLarty admits she had had a "few drinks" during the evening but she denies being drunk as alleged at the time. She has testified that the commotion occurred when Kathlyn started "lipping off" to her and she [Mrs. McLarty] slapped her.

Mrs. McLarty has testified that the baby was "wet, her lungs were congested and she was run down and underfed." Further, Kathlyn has had little patience with feeding the baby, and she frequently left the baby in wet diapers, and she would go all day without putting any clothes on Angela other than diapers and pajamas. According to Mrs. McLarty Kathlyn is "hot headed." When asked for an example Mrs. McLarty referred to an incident in 1969 when Kathlyn kicked her mother. Kathlyn was sixteen years old at the time.

Although the justification of this assumption of custody is not here at issue, and the court has not heard all the evidence concerning same, it appears from the evidence presented to this court by petitioners' witnesses that this child should never have been removed from her mother in the manner in which it was done. The child was in no immediate danger and Mrs. McLarty was clearly wrong to go to Kathlyn's apartment in the middle of the night in an angry state after having had a "few drinks." She further exasperated the situation by slapping Kathlyn when Kathlyn was understandably upset and embarrassed at this midnight intrusion.

Petitioners have referred to Kathlyn's past experiences which they feel indicate immorality and unfitness for parenthood. Yet, they have also acknowledged that their real goal has not been to obtain permanent custody of the child — their age would preclude this — but to assist Kathlyn in becoming a proper and responsible parent so that the child might be returned to her. Removing a child in an atmosphere of hostility is the wrong way to achieve this. Mrs. Nancy Walker, Division of Family Services, has testified, upon

hearing part of the testimony, that her agency's policy is to keep a child in its own home and to assist a parent in becoming responsible and effective unless the child is in immediate danger.

The child was in no *immediate* danger. Whatever can be said about the respondent's "immorality" or "instability," there is nothing to suggest immediate danger. Mr. McLarty's description of the baby's condition and the mother's baby-caring habits describes a great number of normal babies and a great number of normal young mothers. It in no way suggests anything approaching the need for emergency action. The better course would have been to offer constructive assistance and counselling. If the respondent refused to accept such assistance, then the matter could be referred to the Division of Family Services which could then investigate and, if the situation warranted it, bring the matter before the court which could then require that the child and her mother come under the supervision of the court. A child may be removed only when it is clear that court supervision is inadequate to correct an unfit home.

Such procedures are recommended by virtually every manual or textbook on the subject and are the policy of virtually every family service agency in the country. As an example the Governor's Committee on Juvenile Justice. *A Study of the Administration of Juvenile Justice in California,* Part II, 68-69 (1960) has stated —

> "The social agency normally has to exercise initiative and reach out to aid families by helping [parents] realize that child neglect exists. By demonstrating the resources for help which are available in the community and in existing agencies they can aid the parents. Secondly, if the parents cannot profit from the help offered, the agency has the right and the responsibility to seek legal authority, if necessary, to protect the welfare of the children.

> "Based on the experience of social agencies, most parents who neglect their children are not as a rule willfully neglectful, but disturbed people who are so engrossed with their own problems that they are unmindful of their children's needs. In addition, most child welfare experts contend that the child's best opportunity for healthy personality development requires that he grow up in his own home with his own parents."

A child should be precipitately removed from its home only if there is immediate danger to the child's well-being. If a judgment is made that the parent is unfit to properly care for the child, an effort should be made to assist the parent to become capable of parenthood. Failing this a child welfare agency could be brought

into the picture and the procedure set forth above in the Governor's Committee Report should be followed.

This is not only the preferred manner of dealing with parents who may lack the necessary skills and attitudes for responsible parenthood, but the only permissible way under the law unless there be consent. Children may not be removed from their parents simply because relatives or social workers — or even courts — believe the parent is doing an inferior job. Neither a court nor a social agency has any justification to intervene unless the child is dependent as defined in §39.01(8), Florida Statutes.

"Dependency" under the law is broadly defined. A dependent child is one who "has no proper parental . . . care or guardianship; . . . or whose condition or environment are such as to injure or endanger the welfare of the child; . . . or whose home, by reason of neglect, cruelty or depravity, or other adverse condition, on the part of the parents . . . or other person in whose care the child may be is an unfit place for the child." The definition is necessarily broad and vague because the conditions under which a child may be found will vary greatly from home to home and will not lend themselves to precise pre-set characterizations. By defining dependency broadly a juvenile court is given vast powers to act when a child's welfare is threatened by adverse home conditions. Although parental control of one's child is a fundamental right under the United States and Florida constitutions the legislature has determined that the welfare of children can best be assured by avoiding the precise language requirements of the criminal laws, and substituting therefor language broad enough to give juvenile courts jurisdiction to act in any one of the many different and unpredictable situations in which neglected children find themselves.

Although broad, the law does not give a judge carte blanche to impose his values and ideas about child-rearing on every parent who appears before it. A court must recognize that matters which may be of concern to friends or relatives of the parent in question or which may be of concern to the court in a personal sense may offer no justification for court intervention. Alcoholism, criminality, promiscuity, emotional instability and many other qualities in a person certainly diminish one's ability to be a responsible parent; yet, in and of themselves, they do not justify court intervention unless it can be shown that the child is actually neglected as to its basic needs or is otherwise endangered in a substantial, objective and observable sense. Were it otherwise courts and legislatures would be free to remove children from otherwise adequate homes because of one character defect or one mistake in life regardless of a parent's over-all fitness. Far more is required to justify removal

of a child from its parents. All the law requires is that the parent be honest and respectable, with disposition and capacity to maintain and educate his child. Ex parte Bourquin, 290 P. 250. In re Sweet, 317 P.2d 231, held —

> "To justify the courts in depriving parents of the care and custody of their own children, the parent's special unfitness must be shown by evidence that is clear and conclusive and sufficient to make it appear that the necessity for doing so is imperative. And, in attempting to prove the 'special unfitness' referred to, it is not enough to show that the parents have bad habits or faults of character. It must be established that their condition in life and character and habits are such that provision for the children's ordinary comfort and contentment, or their intellectual or moral development, cannot reasonably be expected at their hands."

It is well to consider the nature of the statutory language — "neglect, cruelty or depravity;" "proper or necessary support or education *as required by law;*" "medical, psychiatric, psychological or other care *necessary* for the well-being of the child;" "homeless;" "abandoned;" "injure or endanger the welfare of the child." These are broad terms but they are descriptions of extreme circumstances and cannot apply to instances where the parent's conduct simply fails to measure up to community or court standards.

When dealing with allegations of psychological, emotional or moral deficiencies in the parent the court should be particularly cautious. Not because such matters are less important — they are probably more so. It is far better for a child to be in a psychologically healthy milieu amidst physical deprivation than for him to receive all the physical amenities but be psychologically and emotionally deprived.

The reason for greater restraint in such cases is because such matters frequently involve questions of personal values, general policy, and subjective criteria rather than objective medical evidence. It is one thing for a court to intervene where it concludes, for example, that a parent's mental and emotional instability prevents a healthy relationship between parent and child, thus raising a probability that the child will fail to develop a stable, integrated personality. It is quite another to order removal from parents simply because the parents' behavior departs from conventional community standards or because they can benefit from "psychiatric counselling." Experience has shown that many parents are able to provide a fit home for children despite serious character defects or the need for psychiatric or social counselling. To justify removal it must be shown that such defects are so extreme

as to preclude a reasonable possibility of fitness or that such defects have had and probably will have a substantially deleterious effect upon the children.

Judged by these standards it is clear that this child should not be removed from her mother's custody. This court so ruled on October 30, 1972 and petitioners requested a rehearing, claiming that they believed that the court would grant custody to them on October 26th and they therefore refrained from presenting evidence which would be embarrassing to the respondent.

At that hearing the court announced that it had heard insufficient evidence that the child was dependent but the court was concerned about allegations regarding a Dr. Donald Norman who is familiar with the respondent. Allegedly Dr. Norman had stated that the respondent is "suffering from epilepsy and that she is borderline schizophrenic and paranoid." The court requested the Division of Family Services to investigate these allegations and the Division reported that Dr. Norman stated that Kathlyn's epilepsy is controllable and that he has never diagnosed her as schizophrenic.

At the hearing on petitioners' motion for rehearing Mr. Houghton stated that Dr. Norman told him otherwise. Again the Division was requested to contact Dr. Norman. The doctor reiterated his earlier statement and has sent this court a written report, copy of which is enclosed.

The essence of petitioners' evidence is that Kathlyn has acted immaturely and erratically in her adolescence and during and subsequent to her marriage to Mr. Pitsch, who has since abandoned her and whose whereabouts are still unknown. None of the evidence produced at either hearing makes her unfit as a parent at this time. The child was removed from her custody when the child was an infant and Kathy's husband had recently abandoned her. What little evidence there has been as to her actual parental behavior, as opposed to her moral behavior, does not justify the conclusion that she be barred from assuming her parental rights and responsibilities. There is no evidence of cruelty, there is no evidence of deliberate or substantial neglect, there is no evidence of inability to maintain the child and there is no evidence that the child's welfare is endangered. There is simply evidence and allegations of past immaturity and instability and frictions between the petitioners and the respondent. Intelligent assessment of the respondent's fitness in such circumstances is precluded unless the child is actually with her.

It is therefore ordered that custody of Angela Marie Pitsch shall be returned to the respondent and that all terms of the court order of October 30, 1972 shall stand.

Jurisdiction of this case shall be retained and the child's custody shall be under the supervision of the Division of Family Services which shall file an evaluation and report with this court on or before April 15, 1973.

Respondent has filed a petition charging petitioners with two counts of contempt. One count concerns a refusal to comply with the visitation order of October 26, 1972. The second count charges petitioners with refusing to transfer custody of the child as ordered by the court on October 30, 1972.

That petitioners violated the court orders there is little doubt. The court granted respondent visitation rights on Saturday and Sunday from 10 a.m. to 4 p.m. and petitioners refused to permit this. The court ordered custody to be returned to respondent and petitioners refused to do this.

Petitioners offer as justification for violating the visitation order that the child's regular nap time was 2 p.m. and respondent had to be in Boca Raton (a three hour ride from Lake Placid) at 6 p.m.

As justification for violating the custody order Mr. Houghton testified that he did not know where Mrs. Houghton went when she left with the baby and that he assumed a stay of execution would automatically accompany the petition for rehearing.

Mrs. Houghton testified that following the court order she caught a cold and left with the child so as not to take the risk of exposing her (Mrs. Houghton's) mother, who lives with petitioners, to the cold. She also conceded that her dim view of respondent's ability to care for the child contributed to her decision.

These reasons are patently frivolous. Even if the child has taken her nap precisely at 2 p.m. every single day, there is no reason to believe that she would not take a nap with the respondent or that she would suffer greatly if she napped at 4 p.m. instead of 2 p.m., particularly since she had just awakened at noon. With respect to the respondent's need to be in Boca Raton at 6 p.m., that was for the respondent to worry about and not the petitioners.

Conceivably a litigant might assume that a petition for rehearing would be accompanied by a stay of execution until the matter can be heard. But petitioners' conduct belies this explanation. Upon learning of the court order Mrs. Houghton removed the child, without telling anyone where she was going, in order to prevent the respondent from obtaining custody of the child.

Mr. Houghton claims that he did not know where she went but he knew her well enough to know she was safe with the child. Mr. Houghton cannot evade his responsibility to comply with the court

order by deliberately self-imposed ignorance. Mrs. Houghton went to the logical place — their weekend cottage in Lake Placid — and Mr. Houghton made no apparent effort to contact her or to comply with the order.

The actions and statements of the petitioners demonstrate their disregard for the orders in question. They are free to disagree with them or appeal them, but they are not free to willfully disobey them.

In addition no permission was granted or implied to stay the order pending a rehearing.

The court finds both petitioners to be in willfull contempt of court on both counts. Petitioners have contended that they have been motivated by their concern for their grandchild whom they believed to be getting less than adequate care. The child has now been returned to her mother, as she was bound to be sooner or later, and petitioners' past actions and continuing actions have not helped respondent to be a better mother. Whether petitioners will have continued contact with the respondent or the child is not a matter to be decided by this court and is not known at this time. If the petitioners desire the best for the child, and if they have continued contact with their daughter and granddaughter, they would be advised to assist the respondent constructively.

The court imposes no punishment for contempt at this time but reserves jurisdiction to enter such further orders as to the court seem necessary.